IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-33

Filed: 19 November 2019

Forsyth County, No. 15 CVS 7727

LONG BROTHERS OF SUMMERFIELD, INC., Plaintiff,

v.

HILCO TRANSPORT, INC., Defendant.

Appeal by Plaintiff from order entered 21 November 2017 and judgment entered 12 January 2018 by Judge Anderson D. Cromer in Forsyth County Superior Court. Cross-appeal by Defendant from order entered 28 March 2018 by Judge R. Stuart Albright in Forsyth County Superior Court. Heard in the Court of Appeals 7 August 2019.

*Spilman Thomas & Battle, PLLC, by Matthew W. Georgitis and Steven C. Hemric, and Cartledge Law Firm, by Kevin B. Cartledge, for the Plaintiff-Appellant/Cross-Appellee.*

*Mullins Duncan Harrell & Russell PLLC, by Alan W. Duncan and Stephen M. Russell, Jr., and Carruthers & Roth, P.A., by J. Patrick Haywood and Mark K. York, for the Defendant-Appellee/Cross-Appellant.*

DILLON, Judge.

Plaintiff Long Brothers of Summerfield, Inc., and Defendant Hilco Transport, Inc., are businesses owned by members of the same family and engaged in the commercial trucking industry. A number of years ago, Defendant purchased several commercial trucks and leased them to Plaintiff, giving Plaintiff the option to purchase

the trucks at the end of the lease term. At the end of the lease term, Plaintiff sought to exercise its option, but a dispute arose concerning the purchase price. Plaintiff paid Defendant the amount Defendant claimed to be the correct price. Later though, Plaintiff learned that Defendant had documentary evidence in its possession all along tending to prove that the purchase price should have been the amount Plaintiff had thought it should be. Plaintiff brought this action against Defendant to recover the amount it claims it overpaid for the trucks.

A jury entered a verdict in favor of Plaintiff, though the jury did not treble the damages based on Plaintiff's unfair and deceptive trade practices ("UDTP") claim. However, subsequent to the verdict, the trial court not only denied Plaintiff's motion to treble the award, but also granted Defendant's motion for judgment notwithstanding the verdict. Plaintiff entered a notice of appeal from the post-verdict orders.

After Plaintiff noticed its appeal, Defendant moved the trial court to dismiss Plaintiff's appeal, contending that the notice was untimely. The trial court entered an order denying that motion. Defendant cross-appeals from that order.

## I. Background

### A. Formation of the Parties

Defendant is a family-owned company that has been active in the commercial trucking industry for a number of years. In 2003, Charles Long and his brother

Gurney were the primary owners and officers of Defendant. That year, Charles Long helped his daughter, Wendi Brewer, create Plaintiff, in part, as a means for a family member to bid on trucking contracts where woman-owned businesses were favored in the bidding process.

## B. Accounting Contract

From the beginning of Plaintiff's existence in 2003, Defendant worked closely with Plaintiff, often sharing their truck fleets to fulfill contract obligations. Also, during this time, Plaintiff paid Defendant to provide accounting, bookkeeping, record-storing, and other managerial services to Plaintiff. Nine years later, though, Plaintiff and Defendant terminated this arrangement, as their relationship soured.

## C. The Lease/Option to Purchase Contract for the Trucks

In early 2005, Plaintiff developed a need to grow its own fleet of trucks, as its business continued to grow. Ms. Brewer, however, did not want her company to take on the debt necessary to purchase new trucks. Therefore, she and her father came to an agreement whereby Defendant would purchase several new trucks and then lease them to Plaintiff for four years. They agreed that after the four-year term, Plaintiff would have the option to purchase the trucks from Defendant for a bargain price.

There is no evidence that Ms. Brewer and her father signed a written agreement concerning this transaction. But there is evidence that certain notes were made by them concerning the terms of the agreement. In any event, Ms. Brewer has

always maintained that the agreement gave Plaintiff the option to purchase the trucks from Defendant at the end of the lease term at a discount, rather than for the full market value, based on the four years of rental payments it would have paid.

A short time later, in June 2005, before Defendant had actually purchased the trucks to lease to Plaintiff, Ms. Brewer's father died unexpectedly and his brother, her uncle, Gurney Long assumed control of Defendant.

On 1 August 2005, Ms. Brewer, for Plaintiff, and her uncle, for Defendant, entered into a written contract for the lease of the various trucks for four years (the "Lease Contract"). The Lease Contract did not expressly mention Plaintiff's option to purchase the trucks. The Lease Contract, though, did state that "Schedule 1 and Lease Notes shall be effective at the date of this agreement." "Schedule 1" was a document attached to the Lease Contract and described the trucks. However, there was no "Lease Notes" document attached, at least on the copy that was in Plaintiff's possession.

In 2009, the lease term ended, and Plaintiff sought to exercise its option to purchase the trucks. Defendant agreed to sell the trucks to Plaintiff but sent an invoice stating the price of $620,000, the then-full market value of the trucks. Ms. Brewer disagreed on the purchase price, insisting that she and her father had agreed that Plaintiff would be allowed to purchase the trucks based on a formula which called for the price to be approximately $220,000. Defendant – who at the time still

maintained many of Plaintiff's business records and provided accounting and other managerial services to Plaintiff – assured Ms. Brewer that the correct price was $620,000. Plaintiff purchased the trucks, paying Defendant $620,000 as reflected in Defendant's invoice, though still believing that the correct purchase price was a lower amount.

## D. The "Lease Notes" Resurface

In 2012, three years after Plaintiff purchased the trucks from Defendant, Plaintiff and Defendant essentially cut all business ties. Plaintiff requested that Defendant turn over all of its corporate records that Defendant had maintained for Plaintiff over the years, which Defendant purportedly did.

The next year, in 2013, Defendant's departing chief financial officer uncovered additional business files belonging to Plaintiff and turned them over to Plaintiff. Among them was the "Lease Notes" document, the document purportedly referenced in the Lease Contract. This "Lease Notes" document essentially confirmed Ms. Brewer's memory of her agreement with her father, that Plaintiff would have the option to "purchase the [trucks] at the end of the 48 month lease at 20% of the [trucks'] original cost." There is evidence that, based on this formula, Plaintiff should have paid only approximately $220,000, rather than the $620,000 that Defendant invoiced, for the trucks.

In summary, Plaintiff was formed in 2003 at which time Defendant began providing accounting and other services for Plaintiff. In 2005, Plaintiff entered into a written agreement to lease several trucks from Defendant, an agreement which made reference to "Lease Notes." In 2009, Plaintiff purchased the trucks from Defendant for approximately $620,000, based on Defendant's invoice and assurances that $620,000 was the correct price. In 2013, Defendant's departing CFO provided Plaintiff with the "Lease Notes" document which confirmed Ms. Brewer's understanding that Plaintiff should have only paid $220,000 for the trucks. And in 2015, Plaintiff filed this action to recover the overpayment.

### E. Procedural History

At the conclusion of the trial in the matter, the jury returned a verdict awarding $450,000 to Plaintiff. The trial court immediately entered judgment on the jury's verdict.

Plaintiff moved to have the jury award trebled, based on its UDTP claim. Defendant, though, moved for Judgment Notwithstanding the Verdict ("JNOV"). In November 2017, the trial court entered an order denying Plaintiff's motion to treble the jury award and an order granting Defendant's motion for JNOV (the "JNOV Order"), which essentially nullified the jury award. The JNOV Order contained language recognizing that the trial court would consider a motion to tax costs.

Two months later, on 12 January 2018, following a hearing on costs, the trial court entered an order which taxed costs against Plaintiff and reiterated that Defendant's motion for JNOV was being granted.

A few days later, Plaintiff filed its notice of appeal from the January 2018 judgment. Defendant filed a motion to dismiss Plaintiff's appeal. The trial court denied that motion.

## II. Analysis

### A. Defendant's Cross-Appeal

Defendant cross-appeals, contending that Plaintiff's January 2018 notice of appeal was untimely because it came two months after the trial court entered the JNOV Order. Plaintiff, though, asserts that the true final judgment granting JNOV was not entered until January 2018, four days before it noticed its appeal. In the alternative, Plaintiff has asked this Court to issue a writ of *certiorari* to consider the merits of its appeal.

In its earlier JNOV Order, entered two months before Plaintiff's appeal was noticed, the trial court granted Defendant's Rule 50(b) motion for JNOV, which suggests that a final judgment had been entered. We note, though, that the JNOV Order also stated that at some point in the future, the court would entertain a motion on costs and then "enter a final judgment that addresses the award of costs and

*reflects the granting of Defendant's Motion for Judgment Notwithstanding the Verdict.*" (Emphasis added.)

In either case, to the extent that Plaintiff's notice of appeal was untimely, in the exercise of our discretion, we grant *certiorari* and review Plaintiff's appeal on its merits.[1] *See Dogwood Dev. and Mgmt. Co., Inc. v. White Oak Trans. Co. Inc.*, 362 N.C. 191, 199, 657 S.E.2d 361, 366 (2008) (noting this Court's "core function of reviewing the merits of [an] appeal to the extent possible"). Indeed, the JNOV Order does contain language which could create confusion; and there is no indication that Defendant has otherwise been prejudiced by Plaintiff's noticing an appeal in January 2018, rather than by mid-December 2017. We now turn to the merits of Plaintiff's appeal.

## B. Plaintiff's Appeal

To better understand the issues discussed below, it is important to remember that Plaintiff and Defendant had two contractual relationships. First, Defendant agreed to provide accounting, record-keeping, and other services to Plaintiff, an agreement which Plaintiff contends created a fiduciary relationship. Second,

---

[1] We note Defendant's additional argument that Plaintiff's appeal should be dismissed because Plaintiff served its notice of appeal by e-mail, an ordinarily improper method of service under Rule 26 of the Rules of Appellate Procedure. N.C. R. App. P. 26(c) (describing electronic service as acceptable only where the served document was filed electronically). Our Court has repeatedly found a party's failure to adhere to Rule 26(c) to be a non-jurisdictional error. *See Lee v. Wingett Road, LLC,* 204 N.C. App. 96, 693 S.E.2d 684 (2010); *Stephenson v. Bartlett*, 177 N.C. App. 239, 628 S.E.2d 442 (2006). This is especially true where the opposing party obtained actual notice of the appeal. *MNC Holdings, LLC, v. Town of Matthews*, 223 N.C. App. 442, 445-47, 735 S.E.2d 364, 366-67 (2012).

In any event, as explained above, in our discretion, we grant *certiorari*.

Plaintiff agreed to lease, with the option to purchase, several trucks from Defendant, a type of contract which typically does not, in and of itself, involve a fiduciary relationship.

It is also important to understand the jury's special verdict, in which it answered twenty-three (23) questions. In its complaint, Plaintiff alleges that it was damaged by overpaying Defendant for the trucks. Plaintiff puts forth a number of claims and legal theories, including breach of contract, fraud, UDTP, and constructive fraud.

The jury returned a verdict of $450,000, but not based on all of Plaintiff's legal theories for recovery. Specifically, the jury's verdict form consisted of twenty-three (23) questions regarding Plaintiff's theories of the case, which were answered by the jury as follows:

Constructive Fraud Claim/Constructive Trust: In response to three of the questions (Questions 1-3), the jury determined that (1) Defendant committed "constructive fraud" by taking advantage of a "position of trust and confidence" in causing Plaintiff to overpay for the trucks, (2) Plaintiff filed this action (in 2015) within three years of *discovering the facts* constituting the constructive fraud, and (3)

Plaintiff was entitled to recover $450,000 in damages for Defendant's constructive fraud.[2]

Other Claims Including UDTP: In response to sixteen (16) of the other questions (Questions 4-14, 17-22), the jury determined that Defendant did commit acts constituting fraud, UDTP, negligent misrepresentation, and breach of contract in connection with the 2009 purchase of the trucks, *but that* Plaintiff did not bring suit within the applicable statute of limitations with respect to those claims. Accordingly, the jury made no damages determination for these other claims.

Curiously, though, in answering the last question on the form, Question 23, the jury found that Defendant was "equitably estopped from asserting that the statute of limitations [had] run against [any of] Plaintiff's claims," suggesting that perhaps the jury *should have* made a damages determination as to *all* claims, including the UDTP claim, which allows for treble damages.

Plaintiff moved that the $450,000 damage award for Plaintiff's constructive fraud claim be trebled, based in large part on the jury's response to Question 23. Defendant moved for JNOV. The trial court denied Plaintiff's motion, but granted Defendant's motion for JNOV.

1. Judgment Notwithstanding the Verdict—Constructive Fraud Claim.

---

[2] Based on the jury's response to these three questions, the jury, in Questions 15 and 16, found that Plaintiff's overpayment was subject to a constructive trust remedy in favor of Plaintiff and that Plaintiff commenced the action within three years after discovering the fraud "which serve[s] [as] the basis for its claim for constructive trust."

The trial court entered judgment for Defendant on Plaintiff's constructive fraud claim, notwithstanding that the jury awarded Plaintiff $450,000 for this claim.

We review a trial court's decision on a motion for JNOV to determine "whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury." *Davis v. Dennis Lilly Co.*, 330 N.C. 314, 322, 411 S.E.2d 133, 138 (1991). That is, if there was evidence to support the jury verdict, entry of a JNOV by the trial judge is generally error. And whether a party was entitled to JNOV is a question of law, which we review *de novo*. *Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 267 (2013).

For the reasons stated below, we conclude that the trial court erred in entering JNOV, as there was sufficient evidence from which the jury *could have found* that Defendant committed constructive fraud.

To show constructive fraud, a plaintiff must present evidence that (1) "a confidential or fiduciary relationship exists" which (2) "led up to and surrounded the consummation of [a] transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." *Forbis v. Neal*, 361 N.C. 519, 528, 649 S.E.2d 382, 388 (2007) (internal quotations omitted) (citation omitted).

Our Supreme Court has explained that "constructive fraud" differs from "actual fraud" in that constructive fraud "is based on a confidential relationship rather than a specific misrepresentation." *Barger v. McCoy Hillard*, 346 N.C. 650,

666, 488 S.E.2d 215, 224 (1997).  Also, "constructive fraud" differs from a "breach of

fiduciary duty" claim in that constructive fraud requires that the defendant took

advantage of a position of trust "*to benefit himself.*"  *Id.* (emphasis added).[3]

Here, we conclude that there was sufficient evidence from which the jury could

have found that Defendant held a position of trust with Plaintiff.[4]  Specifically, there

was evidence before the jury that, beginning with its formation in 2003, Plaintiff

operated under the advice and counsel of Defendant; that Plaintiff worked closely

with Defendant in its daily business operations; that Ms. Brewer worked closely with

her father in his capacity as an officer of Defendant to make Plaintiff's business

---

[3] In connection with a purchase contract involving parties where a fiduciary duty exists, our Supreme Court has held that "[w]here a transfer[or] of property stands in a confidential or fiduciary relationship to the transfer[ee], it is the duty of the transfer[or] to exercise the utmost good faith in the transaction and to disclose to the transfer[ee] all material facts relating thereto and his failure to do so constitutes fraud." *Link v. Link*, 278 N.C. 181, 192, 179 S.E.2d 697, 704 (1971).  And when "the superior party obtains a possible benefit through the alleged abuse of the confidential or fiduciary relationship, the aggrieved party is entitled to a presumption that constructive fraud occurred." *Forbis*, 361 N.C. at 529, 649 S.E.2d at 388.

[4] Our Supreme Court has defined a fiduciary relationship as one "in which there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence[.]" *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707-08 (2001) (internal quotations omitted).

We note that a "mere family relationship and general allegations of consultations among family members" do not necessarily create a fiduciary relationship.  *See Terry v. Terry*, 302 N.C. 77, 86, 273 S.E.2d 674, 679 (1981).  Likewise, there is no *per se* fiduciary relationship between an accountant and its client.  *Harrold v. Dowd*, 149 N.C. App. 777, 784, 561 S.E.2d 914, 919 (2002) ("We have found no case stating that the relationship between accountant and client is *per se* fiduciary in nature.").

Nonetheless, our courts have been clear that the existence of a fiduciary relationship is a fact-based inquiry unique to each circumstance.  *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931) (explaining that a fiduciary relationship may exist in a "variety of circumstances[,]" including "every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other").

decisions; and, significantly, Defendant was paid by Plaintiff to provide Plaintiff with administrative, accounting, bookkeeping, and record-keeping services for years.

Defendant insists that, per the evidence at trial, any semblance of a fiduciary relationship between the parties had evaporated by 2009, as Ms. Brewer testified that she no longer believed that her uncle had Plaintiff's best interests in mind. However, the evidence also shows that, at the time of the transaction, Defendant still had possession of Plaintiff's documents and continued to function in its fiduciary roles for several years past 2009.

Further, there is evidence *viewed in the light most favorable to Plaintiff* that Defendant committed constructive fraud: Defendant failed to disclose the existence of the "Lease Notes" that it maintained as part of Plaintiff's business records, a failure which directly benefitted Defendant in its contract to sell trucks to Plaintiff. That is, as explained below, the constructive fraud was not based on any misrepresentation Defendant made in connection with the truck purchase contract directly, but rather on Defendant's breach of its *fiduciary* duty to help manage Plaintiff's business affairs by its failure to alert Plaintiff about the "Lease Notes."

And, finally, there was evidence from which the jury could have found that the constructive fraud was discovered within three years of this action being filed in 2015. Much of Defendant's argument concerning this issue is based on evidence that even if there was fraud, Plaintiff knew or should have known about it in 2009, but waited

six years to bring suit. Indeed, it may seem that the jury verdict is contradictory: The jury found that Plaintiff brought suit within three years of discovering the constructive fraud, *but also found that*, with respect to Plaintiff's ordinary fraud and UDTP claims, Plaintiff did not bring suit within three years of discovering the fraud or within four years of discovering the UDTP.

However, this seeming contradiction can be reconciled. The jury could have determined that Defendant committed fraud in *two different ways*, which were discoverable by Plaintiff at *two different times*: First, there was evidence that Defendant, in its non-fiduciary contractual role as seller of the trucks, committed fraud in 2009 by misrepresenting to the buyer-Plaintiff the price of the trucks in its 2009 invoice, a misrepresentation that Plaintiff suspected and had reason to know about. Indeed, the jury determined that Plaintiff's 2015 complaint was not filed within three years "after discovery of the facts constituting the fraud."

But there is also evidence of a *second* fraud involving a *different* contractual relationship Defendant had with Plaintiff: Defendant, in its contractual role as fiduciary/record-keeper for Plaintiff, committed fraud by withholding from Plaintiff the existence of the "Lease Notes" that it possessed on Plaintiff's behalf, a deception that Plaintiff did not discover until 2013. Indeed, the jury determined that Plaintiff's 2015 suit *was* filed within three years of actually discovering *the act* that constituted the constructive fraud. And though the evidence seems conclusive that Plaintiff had

reason to know that Defendant was being misleading concerning the purchase price in 2009, Plaintiff did not learn until 2013 that Defendant was misleading in its fiduciary role as Defendant's record-keeper about the existence of the "Lease Notes" in its possession, a document which confirmed Ms. Brewer's memory of the deal. And there was evidence from which the jury could find that Defendant, as Plaintiff's record-keeper, had a fiduciary duty to disclose the existence of this document back in 2009 when Plaintiff was disputing the invoice, and that Defendant directly benefited from the breach of this duty, thereby supporting Plaintiff's constructive fraud claim.

Therefore, the jury verdict can be reconciled: The jury could not base its constructive fraud finding on Defendant's fraudulent 2009 invoice and other representations in 2009 that the purchase price for the trucks was $620,000. Indeed, the jury clearly found that the constructive fraud claim was based on facts that were not discovered by Plaintiff until after 2012, within three years of the commencement of this action. And the jury otherwise found that Plaintiff already knew in 2009 that Defendant was misrepresenting the price. Rather, the jury award seemingly is based on Defendant's failure, acting in its fiduciary capacity, to turn over the "Lease Notes" to Plaintiff in 2009; a failure which benefitted Defendant directly, to the tune of $400,000, and that Plaintiff did not discover this constructive fraud until 2013.

We note that there is a contradiction in our case law concerning the appropriate statute of limitations for a "constructive fraud" claim. A constructive

fraud claim is similar to a "breach of fiduciary duty" claim, which has a three-year statute of limitations. And in a number of cases, our Court has recognized that the statute of limitations for "constructive fraud" is also three years, accruing from the discovery of the facts constituting the fraud. *See Carlisle v. Keith*, 169 N.C. App. 674, 685, 614 S.E.2d 542, 549 (2005) ("The statute of limitations in actions for constructive fraud is three years [] which accrues upon discovery of facts constituting the fraud."); *Hunter v. Guardian Life*, 162 N.C. App. 477, 485, 593 S.E.2d 595, 601 (2003) ("The statute of limitations for fraud, constructive fraud, and negligent misrepresentation is three years.").

But in other cases, our Court has recognized that a claim for constructive fraud is subject to a ten-year statute of limitations:

> Allegations of breach of fiduciary duty that do not rise to the level of constructive fraud are governed by the three-year statute of limitations applicable to contract actions contained in N.C. Gen. Stat. § 1-52(1). In contrast, a claim of constructive fraud based on a breach of a fiduciary duty falls under the ten-year statute of limitations contained in N.C. Gen. Stat. § 1-56.

*Wilson v. Pershing, LLC*, 253 N.C. App. 643, 652, 801 S.E.2d 150, 157 (2017) (citations and internal marks omitted). *See also Nationsbank v. Parker*, 140 N.C. App. 106, 113, 535 S.E.2d 597, 602 (2000).

In this case, we do not need to resolve this conflict in our case law: Based on the jury findings, Plaintiff brought suit on its constructive fraud claim within either

statute of limitations. Plaintiff clearly brought the suit within ten years of the 2009 sale. And the jury found that Plaintiff brought suit within three years of discovery of the facts constituting the constructive fraud.[5]

In conclusion, we vacate the JNOV Order and January judgment, and remand with the instruction to enter judgment based on the jury's original verdict in favor of Plaintiff's constructive fraud claim.

### 2. Trebling Damages Based on Plaintiff's UDTP Claim

Plaintiff also appeals from the trial court's refusal to amend the judgment to treble the jury damages award based on the jury's findings that Defendant committed UDTP. We conclude that Plaintiff has failed to show any reversible error.

"North Carolina case law has held that conduct which constitutes a breach of fiduciary duty and constructive fraud is sufficient to support a UDTP claim." *Compton v. Kirby*, 157 N.C. App. 1, 20, 577 S.E.2d 905, 917 (2003). And, most importantly here, a successful claim for UDTP rewards the claimant with *treble*

---

[5]An argument could be made that, assuming the appropriate limitations period is three years for constructive fraud claims, there is evidence from which a jury could have concluded that Plaintiff did not bring its suit in time. Specifically, for fraud-type claims, the cause of action accrues when the plaintiff discovered *or should have discovered* the fraud. Here, though, the jury was merely asked if Plaintiff sued within three years of actually discovering the fraud, rather than within three years of when Plaintiff *should have* discovered the fraud. And there is evidence from which the jury could have found that Plaintiff *should have discovered* the existence of the "Lease Notes" long before 2012. Specifically, Plaintiff's 2005 agreement with Defendant referenced the "Lease Notes." A jury could have determined that Plaintiff should have inquired about these "Lease Notes" in 2009 when it was disputing Defendant's invoice price.

However, Defendant agreed to the wording of the question on the verdict sheet and has otherwise made no argument on appeal concerning the wording of that question. Therefore, any argument Defendant could have raised in this regard is waived.

damages, N.C. Gen. Stat. § 75-16 (2017), and attorney's fees, N.C. Gen. Stat. § 75-16.1 (2017). But a UDTP claim must be brought within four years from when the action accrues. N.C. Gen. Stat. § 75-16.2 (2017).

Based on the verdict sheet, the jury found that Defendant committed UDTP based on the 2009 misrepresentations in the invoice for the trucks, *not* based on Defendant's failure to turn over the "Lease Notes." Specifically, on the verdict sheet, the question answered in the affirmative by the jury was whether Defendant committed UDTP by "direct[ing] its accounting department to prepare an invoice for sale of the leased trucks with an inflated sales price and provide this invoice to [P]laintiff knowing it to be false, misleading, and deceptive."

But the jury also found that Plaintiff did not file its UDTP action "within four years from the date the Defendant allegedly prepared [the] invoice," and therefore did not make any damages determination as to this claim.[6] However, Plaintiff's cause of action did not necessarily accrue when Defendant "prepared [the] invoice," but when Plaintiff discovered or should have discovered that the invoice was false. *See Nash v. Motorola*, 96 N.C. App. 329, 331, 385 S.E.2d 537, 538 (1989), *aff'd*, 328 N.C. 267, 400 S.E.2d 36 (1991) (holding that UDTP claim based on fraud accrues when the plaintiff "discovered or *should have . . . discovered*" the fraud). We conclude, though,

---

[6] The jury verdict sheet instructed the jury to skip the damage question regarding Plaintiff's UDTP claim *if* it determined that Plaintiff did not bring suit within four years of Defendant's act constituting the UDTP.

that any error in the way the question was phrased on the jury verdict sheet did not constitute reversible error for at least two reasons.

First, Plaintiff did not complain at trial about the language in which the question was phrased on the verdict sheet.

And second, the jury otherwise did find, with respect to Plaintiff's common law fraud claim, that Plaintiff *did* discover (or should have discovered) Defendant's fraud of overcharging more than three years before bringing suit, suggesting that the jury determined that Plaintiff knew or should have known *in 2009* that Defendant's invoice misrepresented the agreed-upon price. It may be that Plaintiff may not have had or known about the smoking gun proof of the fraud, i.e., the "Lease Notes" in 2009, but its owner, Ms. Brewer, otherwise knew or had reason to know that Defendant was misrepresenting the price. *See Vail v. Vail*, 233 N.C. 109, 63 S.E.2d 202 (1951).[7]

Plaintiff, though, argues that the statute of limitations should not have barred its UDTP claim because the jury found, in answer to the last question (Question 23) on the verdict sheet, that Defendant was "equitably estopped" from asserting the

---

[7] In *Vail*, our Supreme Court explained that the statute of limitations for a fraud claim begins to run when the fraud is or should have been discovered. The Court further explained that where one is defrauded by a fiduciary, she "is under no duty to make inquiry until something occurs to excite [her] suspicions." *Vail,* at 117, 63 S.E.2d at 208. But there was evidence here that Ms. Brewer's suspicions had been excited by the invoice . . . that she knew something was amiss, as she was a party to the conversation with her father when the price was established. There was evidence from which the jury could have found that Ms. Brewer knew or should have known of the fraud, as contained in Defendant's invoice, as soon as she received the invoice.

statute of limitations as a defense. It is problematic that the trial court did not list this question first. The jury would have then been able to ignore the other statute of limitations question with respect to the UDTP claim and then answered the damages question with respect to that claim.

But we conclude that any error concerning the jury's answer to Question 23 was harmless. Specifically, based on the reasoning below, we hold that the question should never had been asked, as there was *no evidence* from which the jury could have found that Defendant was equitably estopped from relying on the statute of limitations defense.

Indeed, our Supreme Court has held that equitable estoppel will "deny the right to assert [a statute of limitations] defense when the delay [by the plaintiff in filing the suit] has been induced by acts, representations, or conduct, the repudiation of which would amount to a breach of good faith." *Nowell v. A&P*, 250 N.C. 575, 579, 108 S.E.2d 889, 891 (1959); *see also Christie v. Hartley*, 367 N.C. 534, 538, 766 S.E.2d 283, 286 (2014). For instance, our Supreme Court has stated that equitable estoppel may apply where a defendant "request[s] the [plaintiffs] to delay the pursuit of their legal rights." *Lewis v. N.C. Highway*, 228 N.C. 618, 620, 46 S.E.2d 705, 707 (1948).

In this case, though, there is no evidence that Defendant ever did anything to induce Plaintiff to delay filing suit after Plaintiff became aware (or should have become aware) of Defendant's misrepresentation of the purchase price. Indeed, the

only alleged misrepresentation here is the one concerning the purchase price to be $620,000, a position that Defendant has never repudiated. There was no misrepresentation that Defendant would work with Plaintiff to resolve the dispute or otherwise requested or induced Plaintiff to hold off on filing suit.

Accordingly, we conclude that there was no reversible error concerning the trial court's denial of Plaintiff's motion to treble the damages award. Plaintiff's UDTP claim was based solely on the misrepresentation in 2009 concerning the purchase price. And there was evidence that Plaintiff knew, or should have known, in 2009 – six years before commencing this action – that the price was being misrepresented. And there is no evidence that Defendant did anything to induce Plaintiff to delay filing suit. It may be that Plaintiff would have been successful in submitting a UDTP claim *based on the constructive fraud*, that is, based on Defendant's breach of its fiduciary duty to disclose the existence of the "Lease Notes," rather than based merely on the breach of the lease/sale contract. Indeed, a UDTP claim based on the constructive fraud may have been timely, as Plaintiff did not discover the existence of the "Lease Notes" until 2013. But Plaintiff did not request a jury instruction for UDTP based on Defendant's constructive fraud.

## III. Conclusion

As to Defendant's cross-appeal, to the extent that Plaintiff failed to timely notice an appeal, we grant Plaintiff's request for a writ of *certiorari*, in order to reach the merits of Plaintiff's appeal.

As to Plaintiff's appeal, we reverse the trial court's grant of Defendant's JNOV motion but affirm the trial court's denial of Plaintiff's motion to treble the damages award. We remand the matter with instructions to enter judgment in favor of Plaintiff in the amount of the jury's verdict, $450,000.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Judges ZACHARY and BROOK concur.